IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 23-cr-00259-CNS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ED DEAN JAGERS II,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Bryan David Fields, Assistant United States Attorney for the District of Colorado, and the defendant, Ed Dean Jagers II, personally and by counsel, Rick Kornfeld, Esq., submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

### I. AGREEMENT

**A. Defendant's Plea of Guilty:**

1.     The defendant agrees

    (a)     to waive indictment and plead guilty to an Information charging conspiracy to defraud an agricultural insurance program in violation of 18 U.S.C. § 371;

COURT
EXHIBIT
1

      (b)     to waive certain appellate and collateral attack rights, as explained in detail below.

      (c)     be liable for restitution to the United States in the amount of $1,036,625 which could include joint and several liability for some or all of the amount with other as yet uncharged co-conspirators;

      (d)     agree not to contest forfeiture, as more fully set forth below.

**B. Government's Obligations:**

    2.     This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). The government agrees that the sentence in this case should be premised on an Offense Level of 19, before any applicable Chapter 5 departures, and agrees that its recommended sentence in this case will not exceed the bottom end of a sentencing range based on Offense Level 19. The government further agrees not to bring other charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado concerning the scheme to defraud an agricultural insurance program providing rainfall index policies by damaging rain gauges owned or operated by the United States government.  Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a superseding indictment.

    3.     Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a

two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a)
and agrees to file a motion requesting that the defendant receive a one-level
reduction for acceptance of responsibility pursuant to USSG §3E1.1(b).

4.      The government agrees to recommend a sentence at the bottom end of
the applicable guideline range for the criminal history and total offense level,
calculated by the Court at sentencing.

**C. Defendant's Waiver of Appeal:**

5.      The defendant is aware that 18 U.S.C. § 3742 affords the right to
appeal the sentence, including the manner in which that sentence is
determined. Understanding this, and in exchange for the concessions made by the
government in this agreement, the defendant knowingly and voluntarily waives the
right to appeal any matter in connection with this prosecution, conviction, or
sentence (including the restitution order), unless it meets one of the following
criteria:

(a)     the sentence exceeds the maximum sentence provided in the
statute of conviction, 18 U.S.C. § 1361;

(b)     the sentence exceeds the top end of the advisory guideline range
from the Sentencing Guidelines that applies for the defendant's
criminal history (as determined by the district court) at a total
offense level of 19; or

(c)     the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his
sentence exceeds the statutory maximum sentence.  But if one of the latter two

criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

6.      The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

   (a) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

   (b)  the defendant was deprived of the effective assistance of counsel; or

   (c) the defendant was prejudiced by prosecutorial misconduct.

7.      The Defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings.  In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

8.      The Defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors

set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**D.** Forfeiture of Assets

9.     The defendant admits the forfeiture allegation. The defendant further agrees to forfeit to the United States immediately and voluntarily  any and all assets and property, or portions thereof, identified herein pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere, namely, a forfeiture money judgment in the amount of $1,036,625.  The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

10.     Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture. However, the United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the  judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other

applicable laws, if the legal requirements for recommendation are met and to relay

any such payments made to victims through remission or restoration to the Clerk of

Court to be offset against restitution. The defendant understands that the United

States Attorney's Office only has authority to recommend such relief and that the

final decision of whether to grant relief rests solely with the Department of Justice,

which will make its decision in accordance with applicable law.

## II.   ELEMENTS OF THE OFFENSES

11.   The parties agree that the crime of conspiracy charged in the

Information, a violation of 18 U.S.C. § 371, has the following elements:

(a)   *First*, that the defendant agreed with at least one other person to violate the law;

(b)   *Second*, that one of the conspirators engaged in at least one overt act furthering the conspiracy's objective;

(c)   *Third*, that the Defendant knew the essential objective of the conspiracy;

(d)   *Fourth*, that there was interdependence among the members of the conspiracy, that is, members in some way or manner intended to act together for their shared mutual benefit within the scope of the conspiracy charged.[1]

12.   The parties further agree that the object of the conspiracy — to make a

false statement to a  — has the following elements:

(a)   *First*, the APPROVED INSURANCE PROVIDER, was reinsured by the Federal Crop Insurance Corporation;

---

[1] Tenth Circuit Pattern Jury Instruction No. 2.19 (2021 ed.).

     (b)    *Second*, the defendant made materially false statements to the APPROVED INSURANCE PROVIDER;

     (c)    *Third,* defendant knew the statement was false when he made it;

     (d)    *Fourth*, defendant intended to influence the APPROVED INSURANCE PROVIDER for the purpose of obtaining an indemnity under a rainfall index insurance policy.[2]

### III.    STATUTORY MAXIMUM SENTENCE

13.    The maximum sentence for a violation of the count in the Information is: not more than 5 years' imprisonment; maximum term of supervised release 3 years; maximum fine $250,000; $100 mandatory victim's fund assessment fee; restitution in the amount of $1,036,625.

### IV.    COLLATERAL CONSEQUENCES

14.    The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V.    STIPULATION OF FACTS

15.    The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties

---

[2] Tenth Circuit Pattern Jury Instruction No. 2.48 (2021 ed.) (modified)

disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

16.     This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

17.     The parties stipulate that the following facts are true and correct:

18.     The relevant conduct in this case began no later than approximately July 2016 and continued to June 2017.

19.     At all times relevant to the conduct described below, the defendant was a Colorado resident with a home in Baca County, Colorado.  Unless otherwise specified, all of the conduct below took place within the state and District of Colorado.

## A.     The Federal Crop Insurance Program

### 1.     *The Structure of the Program*

20.     The United States Department of Agriculture's Risk Management Agency administers the Federal Crop Insurance Program through the Federal Crop Insurance Corporation ("FCIC").  Federal crop insurance is typically sold through private insurance companies, called Approved Insurance Providers.  These private insurance companies directly insure producers and their crops, and then the FCIC reimburses private insurance companies pursuant to standard reinsurance

agreements.

21.     The FCIC makes several types of crop insurance available to cover different types of risk.  One broad category of plans is called "Multiple Peril Crop Insurance," which can itself come in different forms.  Among them is insurance based on the Rainfall Index.

22.     The Rainfall Index is generated from weather data collected and maintained by the National Oceanic and Atmospheric Administration's Climate Prediction Center (the "Climate Prediction Center"). The index reflects how much precipitation is received relative to the long-term average for a specified area and timeframe.

**B.     Rainfall Index Annual Forage Insurance Plans**

23.     The Rainfall Index Annual Forage Insurance Plan provides coverage for annual crops planted for forage or fodder intended for, but not limited to, grazing, haying, grazing/haying, grain/grazing, green chop, grazing/green chop, or silage. This product is similar to area risk insurance and provides area-wide coverage. The program is based on the Rainfall Index and insures producers based on the deviation from normal precipitation.

a.     The Rainfall Index uses National Oceanic and Atmospheric Administration Climate Prediction Center data. The areas where the Rainfall Index is available have been divided into 12 by 12 mile grids. These grids do not follow county lines or township boundaries. Producers must select at least two, 2-month

time periods, called index intervals, when rain is important to the operation. Insurance payments are calculated using National Oceanic and Atmospheric Administration Climate Prediction Center data for the grid(s) and the chosen index interval(s). Cross-referencing these intervals with the grids results in an expected grid index, which is the historically expected precipitation expressed as a percentage. As precipitation arrives during a given interval, the data from National Oceanic and Atmospheric Administration Climate Prediction Center  is used to create the final grid index. If the final grid index is less than the trigger grid index, which is the coverage level times the expected grid index, a loss payment may be issued. This insurance product only provides coverage for a lack of rainfall and is based on rainfall for the entire grid, not individual farms or ranches or specific weather stations within a particular grid. An index of 100% is average precipitation. Anything below 100% represents below-average precipitation, and anything above 100% is above-average precipitation.

      b.     The program is focused on the amount of precipitation, not on actual crop production.  This means that a farmer can receive a payment when precipitation is below the historical normal level even if the relevant farmland suffers no loss in productivity.

      c.     The gridded precipitation data is not based on the measurement of precipitation from a specific rain gauge in a corresponding grid.  Rather, the Climate Prediction Center gets data from a minimum of four reporting stations

closest to the center of the grid, with different stations potentially used from day to day if a reporting station has no data on a given day.  This means that a farmer might have more or less rain in a specific location than reflected in the interpolated value for the entire grid.

24.    A farmer who purchases a Rainfall Index Annual Forage Insurance Plan pays a premium and may receive an indemnity based on several factors:

a.    First, the farmer selects the grid where he would grow his forage.  Because his farm might sprawl over more than one grid, he might select multiple grids.

b.    Second, the farmer selects the two-month period (the index interval) when he needs precipitation to produce the forage on that grid.  If, say, a farmer needs rain in March and April to grow the forage and is concerned about a drought during that period, he would select March and April as the index interval being insured.

c.    The third decision by the farmer is selecting a "productivity factor." The productivity factor is a variable that allows a farmer to claim that his particular farmland is more or less productive than a base value in his county.  If, for example, a farmer thinks his farm is 20% more productive than the base value, he would choose a productivity factor of 120.  If he thought it was 20% less productive, he would choose a productivity factor of 80.

d.    Fourth, a farmer selects his "coverage level."  This is used to

determine the "trigger grid index," which determines whether the farmer will receive an indemnity. The coverage level is also expressed as a percentage. If, for example, a farmer selects a coverage level of 90, then the "trigger grid index" is threshold of precipitation that will cause the insurance to indemnify the farmer. Rainfall that is equal or more than 90% of the expected grid index will result in no indemnity; rainfall less than 90% of the expected grid index will result in an indemnity.

      e.     Premiums are calculated using (1) the number of acres insured, (2) the productivity factor selected for the insured land, and (3) the coverage level. Take, for example, 100 acres of farmland in a county with a base value of $20 per acre of farmland. If the farmer insures all of that farmland, states that his farm is 20% more productive than average, and wants insurance when the precipitation is less than 90% of the historical average for a particular index interval, his monthly premium to insure the farmland in that interval is (100 (acres) * (.90 (coverage level) * 1.20 (productivity factor) * $20 (base rate)) equal to $2,160 of policy protection. Premium rates are set based on Climate Protection Center data. If the premium rate is, say, 0.1000 then the premium for that amount of protection is approximately $216.

      f.     Fifth and finally, a farmer can allocate the premiums on farmland in a particular grid over several index levels. To take the example above, a farmer can allocate his premiums over the index intervals in April and May and

in July and August, putting 60% towards the first and 40% to the second. Under this scenario, he would have policy protection of $1,296 in premium on the first interval and $864 for the second.

        g.    The farmer would receive an indemnity if the "trigger grid index" — his coverage level multiplied by the expected grid index — is less than the final grid index. The indemnity amount is based on a "payment calculation factor" that is equal to the trigger grid index minus the final grid index divided by the trigger grid index. That calculation factor is then multiplied by the premium to give the payment per acre. Drawing from the examples above, assume that the farmer insured his 100 acres of farmland 100% in the April and May index interval at a 90% coverage level. If the "final index level" — the final precipitation calculated by the Climate Protection Center — was 80, then the farmer would get an indemnity because the precipitation was 80% less than expected. The payment calculation factor would be (90-80/90) 0.111. The total indemnity for the $2,160 of policy protection purchased for $216 would be approximately $239.76.

        h.    The Federal Crop Insurance Corporation subsidizes the 90% coverage level at 51%. In the above example, this means that the government would have paid approximately $110.16 of the $216 premium, while the farmer would have paid the remaining $105.85.

    **C.**    **Weather Gauges**

25.     The National Oceanic and Atmospheric Administration and National Weather Service used various devices to collect climate data, including the Automated Surface Observing System (ASOS).  ASOS served as the nation's primary surface weather observing network and supports forecast and warning activities, aviation operations, and the needs of the meteorological, hydrological, and climatological research communities. ASOS units were originally deployed with the Heated Tipping Bucket (HTB) rain gauge as the precipitation accumulation sensor. The All Weather Precipitation Accumulation Gauge (AWPAG) measures precipitation by weighing total accumulation using rain gauge technology to convert the weight of the accumulated liquid to an electrical signal that is reported in real time observations disseminated nationally. Only select NWS ASOS units were upgraded equipped with the AWPAG rain gauge due to its improved accuracy reporting precipitation amounts during different phases (rain and snow) of precipitation. The ASOS gauges and sensors were subject to routine quality control, preventive maintenance and calibration by trained technicians to ensure accuracy in reporting. At the time of the events described in this plea agreement, there were currently more than 900 ASOS sites in the United States to include three NOAA-NWS ASOS units in southeastern Colorado. One was located in the Springfield Comanche National Forest in Baca County (Unit ID: KSPD) at the Little Washington Work Center. It is colloquially known as the "Little Washington" rain gauge.  A second was located at the La Junta Municipal Airport in Otero County

(Unit ID: KLHX) and is colloquially known as the La Junta Airport rain gauge. The third was near Lamar Colorado (Unit ID: KLAA). In addition to those AWPAG gauges, the National Weather Service operated rain gauges in Coolidge, Kansas (Unit ID: COOK1); Syracuse, Kansas (Unit ID: SYRK1); Elkhart, Kansas (Unit ID: EHA), Kendall, Kansas (Unit ID: KENK1); Kim, Colorado (Unit ID: KCGC2), Ellicott, Colorado (Unit ID: BSQC2), and Ordway, Colorado (Unit ID: ORDC2)

### D.   The Defendant's agreement to obtain insurance indemnities under false pretense

26.    The defendant was a rancher in Southeast Colorado.

27.    The defendant agreed with PATRICK ESCH and others, known to the parties but identified here as Co-Conspirators 1 and 2 ("CC-1" and "CC-2) between January 2017 and approximately June 2017 to engage in a scheme to fraudulently obtain insurance indemnities from the APPROVED INSURANCE PROVIDER under the false pretense that there was less rain over the relevant area than was actually the case.  To carry out that scheme, the members of the conspiracy tampered with, damaged, and used other means to prevent rain gauges in southeast Colorado from accurately measuring rainfall.  It was part of the agreement that the defendant would personally tamper with the Lamar rain gauge. CC-1's role in the conspiracy was to tamper with the Little Washington rain gauge. PATRICK ESCH's role in the conspiracy was to tamper with rain gauges elsewhere in Colorado and Kansas.  PATRICK ESCH hired CC-2 to help him with this task and paid CC-2 to do the tampering.

28.     The conspirators used various means and methods to tamper with rain gauges. The defendant typically used an agricultural disc blade to cover up Lamar rain gauge. CC-1 used a pan, sometimes referred to as a "pie tin" or a "cake pan" to cover the Little Washington rain gauge during precipitation events. PATRICK ESCH covered gauges with agricultural devices, but used other means as well, such as filling gauges with silicone to prevent them from collecting moisture, cutting wires on the gauges, or detaching and then tipping over the bucket designed to collect precipitation. CC-2 covered gauges with agricultural devices, used a hammer and tap to punch holes in the collection mechanism and removed the collection bowl from gauges. The Defendant was not aware of the specific methods that were used his coconspirators, but he knew that others involved in the conspiracy were tampering with rain gauges to accomplish its objective, which was to prevent those gauges from operating so that the defendant, CC-1 and PATRICK ESCH could then obtain indemnities from the APPROVED INSURANCE PROVIDER under the false pretense that there less rain had fallen than was actually the case.

29.     The government's evidence of tampered rain gauges is summarized in the chart below, which identifies the tampered rain gauges according to their National Weather Service (NWS) identification code and name, the date the tampering was identified, how the tampering was reported, the suspected method of tampering, and the government agency that owned the rain gauge. The date the

tampering was discovered is not necessarily the date of the actual tampering, which

would have occurred on a prior unknown date:

| Gauge | Date | Reporter | Suspected Method | Owner |
|---|---|---|---|---|
| SYRK1 Syracuse, Kansas | 01/01/17 | USGS Employee | Wires Cut | USGS |
| COOK1 Coolidge, Kansas | 02/22/17 | USGS Employee | Wires Cut | USGS |
| KLHX La Junta, Colorado | 03/21/17 | NWS Employee | Hole punched in brass collector | FAA |
| ORDC2 Ordway, Colorado | 03/28/17 | NWS Employee | Standard Rain Gauge (SRG) missing and, after replacement, was found to have a hole puncture | NWS |
| SYRK1 Syracuse, Kansas | 03/28/17 | USGS Employee | Silicone found in funnel | USGS |
| COOK1 Coolidge, Kansas | 03/29/17 | USGS Employee | Silicone found in funnel | USGS |
| KSPD Springfield, Colorado | 03/29/17 | NWS Employee | "Cake pan" found covering gauge | NWS |
| BSQC2 Ellicott, Colorado | March 2017 | Cooperative Observer Program volunteer | Standard Rain Gauge (SRG) missing | NWS |
| KSPD Springfield, Colorado | 04/03/17 | Baca County Sheriff's Office (BCSO) Deputy | "Cake pan" found covering gauge | NWS |
| KLHX La Junta, Colorado | 04/05/17 | NWS Employee | Silicone found in bucket | FAA |

| | | | | |
|---|---|---|---|---|
| WLS01<br>Walsh, Colorado | 04/05/17 | Colorado State University Employee | Silicone found in funnel | CoAgMET |
| EHA<br>Elkhart, Kansas | Sometime before 04/06/17 | NWS Employee | Metal Plate | NWS |
| EHA<br>Elkhart, Kansas | Sometime before 04/06/17 | NWS Employee | Silicone in Funnel | NWS |
| KLHX<br>La Junta, Colorado | 04/21/17 | NWS Employee | Silicone found in bucket | FAA |

30.    The defendant personally tampered with the gauge at Lamar, He was aware that CC-1 tampered with the gauge at Little Washington.

31.    The defendant stipulates and agrees that he submitted claims seeking an indemnity under policies 1027421 and 1017590 under the false pretense that rainfall measurements were accurate when, in fact, the defendant had taken steps to ensure that they were not and knew they were not.

32.    The parties stipulate and agree that, as a result of the conspiracy, the defendant, CC-1 and PATRICK ESCH submitted  false and fraudulent statements to the APPROVED INSURANCE PROVIDER resulting in inflated indemnities of $3,131,066.65.  $1,036,625 of that amount was directly attributable to the actions of the defendant and CC-1, though the defendant received less than this full sum.  The remaining amount was directly attributable to PATRICK ESCH and CC-2.  This amount represents the amount the defendant caused the government to lose as a result of his conspiratorial agreement to tamper with rain gauges for the purpose of

defrauding the APPROVED INSURANCE PROVIDER and, ultimately, the Federal Crop Insurance Corporation.

## VI.    ADVISORY GUIDELINE CALCULATION

33.    The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

34.    The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate.  The parties understand that the government also has an independent obligation to assist the Court in making an accurate determination of the correct guideline range.  To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

(a)    Under Section 2X1.1, cross-referencing 2B1.1, the base offense level is 6.

(b)    Under Section 2B1.1(b)(1)(C) the offense level is increased by 16 because the losses were more than $1,500,000 but less than $3,500,000.

(c)     The adjusted offense level is 22.

(d)     The parties agree that so long as the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, he should receive a two level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a). The resulting total offense level is 19.

(e)     The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions.  The parties believe the defendant is in criminal history category I.

(f)     The career offender/criminal livelihood/armed career criminal adjustments do not apply.

(g)     The advisory guideline range resulting from these calculations is 30-37 months.

(h)     Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be $10,000 to $100,000, plus applicable interest and penalties.

(i)     Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term at least 1 year, but not more than 3 years.

(j)     The defendant stipulates and agrees that he shall owe restitution to the United States in the amount of $1,036,6255 joint and several with other coconspirators.

## VII.     ENTIRE AGREEMENT

35.     The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement,

neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: _9-28-23_

ED DEAN JAGERS II
Defendant

Date: _9/28/2_

Rick Kornfeld, Esq.
Attorney for Defendant

Date: _9/28/23_

Bryan David Fields
Assistant U.S. Attorney